UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PENSION BENEFIT GUARANTY
CORPORATION, on its own behalf and
on behalf of APL/NVF CONSOLIDATED
PENSION PLAN,

        Plaintiff,

v.

EVANS TEMPCON, INC. and STATE OF
MICHIGAN,

        Defendants.

_____/

Case No.  1:14-CV-782

HON. ROBERT HOLMES BELL

## **O P I N I O N**

This ERISA action came before the Court on Plaintiff's motion for appointment of

a receiver.  (ECF No. 28.)  For the reasons that follow, the motion will be granted.

## **I.**

The Court held a hearing on the motion for appointment of receiver on March 12,

2015.  The parties did not present any live testimony.  The Court will accordingly make its

decision based on the documentary evidence presented with the parties' briefs.

Plaintiff, the Pension Benefit Guaranty Corporation ("PBGC"), on its own behalf and

on behalf of the APL/NVF Consolidated Pension Plan, filed this action against Defendant

Evans Tempcon, Inc. ("Evans") for collection of unpaid contributions to the APL/NVF

Consolidated Pension Plan (the "Pension Plan").  The State of Michigan is also named as a

defendant in this action because it has a lien against Evans' property.  (ECF No. 28-7.)

Plaintiff PBGC is the United States government agency that administers the pension insurance program under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301-1461.

Defendant Evans is a business in Grand Rapids, Michigan that manufactures HVAC products for recreational vehicles and trucks.  (Nestor Dep. 107, ECF No. 28-12.)  Evans has approximately 100 employees.  Victor Posner was the sole owner of Evans' stock.   Posner was also the owner of a number of other business interests, including real estate holdings in Florida, Maryland, and Pennsylvania.  Posner died in 2002.  Posner's business interests ( the "Operating Entities"), including Evans,  are now owned by the Estate of Victor Posner (the "Estate").  The Pension Plan is a consolidated pension plan for all of Posner's businesses that are in the Estate.

The Pension Plan is an ongoing, single-employer defined benefit plan covered by Title IV of ERISA.  *See* 29 U.S.C. § 1321.  The Estate is the "contributing sponsor" of the Pension Plan pursuant to 29 U.S.C. § 1301(a)(13).  (ECF No. 28-4.)  As the contributing sponsor, the Estate is responsible for making funding contributions to the Pension Plan.  *See* 29 U.S.C. § 1082(b)(1).  The Estate has admitted in filings with the PBGC that it has not made the minimum funding contributions to the Pension Plan since 2009.  (*Id.*)

Evans is a member of the Estate's "controlled group."  *See* 29 U.S.C. § 1301(a)(14). As a member of the Estate's controlled group, Evans is jointly and severally liable for the

2

Estate's liability under ERISA.  *See* 29 U.S.C. § 1307(e)(2).

When the balance of unpaid minimum funding contributions to the Pension Plan exceeded $1 million, a federal tax lien arose against the Estate and each member of its controlled group, including Evans, pursuant to the tax code, 26 U.S.C. § 430(k), and ERISA, 29 U.S.C. § 1083(k).  The PBGC perfected its liens against Evans' real and personal property in July 2013 by filing with the Kent County Register of Deeds and the Florida Department of State.  (ECF No. 28-5.)

When the PBGC perfected its liens Evans owed approximately $10 million in unpaid funding contributions.  Since then, the PBGC has filed additional notices of liens, which now total over $16 million.  In addition to the liens for unfunded contributions, Evans also has contingent liabilities for unfunded benefit liabilities and termination premiums.   The fair market value of Evans free and clear of all  liens is $10 million.  (Nestor Dep. 251, ECF No. 28-12.)   Evans has had notice of the liens since August 5, 2013.

On July 29, 2014, the PBGC made an administrative determination that the Pension Plan will be unable to pay benefits when due and that the Plan must be terminated in order to protect the interests of the Pension Plan's participants.  (ECF No. 28-8.)  The PBGC filed this action against Evans on July 22, 2014, pursuant to 29 U.S.C. § 1303(e)(1).  Through this action the PBGC seeks a judgment of $16,237,566 plus interest after July 15, 2014; a declaration that PBGC has validly perfected liens on all Evans' property; and enforcement of its liens through foreclosure and writs of execution.  (Compl., ECF No. 1.)  In October

2014, the PBGC filed an action in the U.S. District Court for the Southern District of Florida to terminate the Pension Plan. *PBGC v. Asset Manager, Inc.*, Case No. 0:14-CV-62302-WPD (S.D. Fla. 2014).

Of the various Operating Entities, Evans is the only manufacturing enterprise and the only business that is regularly receiving income.   Between August 5, 2013, and October 7, 2014, after receiving notice of the PBGC's liens, Evans transferred over $1.8 million in assets to the Estate, its affiliates, and to insiders, including $37,075.00 to Brenda Nestor, the president of Evans, and $234,195.49 to Homauon H. Noroozi, Evans' Chief Operating Officer.  (ECF No. 28-25.)

On October 8, 2014, this Court entered a stipulated order prohibiting Evans from transferring any Evans property outside of the ordinary course of business.  (Order ¶ 4; ECF No. 17.)  The order also required Evans to provide the PBGC on an ongoing basis with copies of all of its bank statements for each month, from June 2014 forward.  (*Id.* at ¶¶ 5-6.) PBGC has presented evidence that after the order was entered, Evans has continued to transfer its property outside the ordinary course of business, including a transfer of over $45,000 to Noroozi in October and November 2014.  (ECF No. 28-25.)

Evans asserts that all of the transfers were made in the ordinary course of business. Evans' assets have regularly been transferred to fund the payroll for the Estate and the Operating Entities.  (Nestor Dep. 95-97, 102-107.)  According to Nestor, for over 64 years, it has been the ordinary course of business to transfer funds between Posner's business

entities depending on the financial circumstances of those entities.  (Nestor Decl. ¶ 3, ECF No. 36-1.)  Nestor asserts that since 2009 she has made over $2.4 million in personal loans designed to keep Evans and the other Operating Entities in business.  (Nestor Decl. ¶ 9, ECF No. 36-1; Nestor Dep. 108-14.)  She further asserts that she has ensured that the Estate and its related entities have paid approximately $55 million in estate and gift taxes and over $22 million in pension contributions.  (Nestor Decl. ¶ 14.)  Noroozi asserts that between February 5, 2014 and October 8, 2014, he loaned Evans approximately $279,000, and that the $45,000 in payments he received in October and November 2014 were the final repayments on the loans he previously made to the company.  (Nozoori Decl. ¶¶ 2-7, ECF No. 36-3.)

Nestor is compensated at the rate of $500,000 per year by Evans, and an additional $500,000 per year by Asset Manager (one of the Operating Entities).  (Nestor Dep. 117.)  Nestor does not deny the PBGC's assertions regarding her compensation.  However, she asserts that she has not taken any salary or payments from Evans since May 2013, and that Evans currently owes her $750,000 in unpaid salary.  (Nestor Decl. ¶ 11, ECF 36-1.)

PBGC is now requesting the court to appoint a receiver to manage Evans' business and affairs during the pendency of this foreclosure action in order to protect the property from further harm, loss, and diminution.

## II.

Federal law governs the appointment of receivers.  *Nat'l P'ship Inv. Corp. v. Nat'l Housing Dev. Corp.*, 153 F.3d 1289, 1291 (11th Cir. 1998); Fed. R. Civ. P. 66.  "A district

court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court." *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). However, the appointment of a receiver is an extraordinary remedy and should only be employed where clearly necessary to protect the plaintiff's interests in the property. *Resolution Trust Corp. v. Fountain Circle Assocs. Ltd. P'ship*, 799 F. Supp. 48, 50 (N.D. Ohio 1992); *see also* 12 Federal Practice and Procedure § 2983, at 21 (1973). The Court should not appoint a receiver if less drastic remedies exist. *Sheet Metal Workers' Local 7 v. Essex Mech., LLC*, No. 1:08-CV-1177, 2009 WL 3246959, at *2 (W.D. Mich. Oct. 6, 2009) (Jonker, J.).

The purpose of a receivership is "to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *Id.* A receivership is not an end in itself; a district court may appoint a receiver only when the appointment is "'ancillary to some form of final relief.'" *Resolution Trust*, 799 F. Supp. at 49 (quoting *Gordon v. Washington*, 295 U.S. 30, 38 (1935)). Appointment of a receiver may be appropriate when it is ancillary to some form of final relief such as foreclosure. *Id*. at 50.

Although courts consider a number of factors in deciding whether to appoint a receiver, the two most important factors are whether there is inadequate security for the debt and whether the debtor is insolvent. *Id.* (citing *View Crest Garden Apts. Inc. v. United States*, 281 F.2d 844 (9th Cir.1960), and *Garden Homes Inc. v. United States*, 200 F.2d 299,

301 (1st Cir. 1952)).  Other relevant factors include:

> (1) imminent danger exists that the property would be lost, concealed, injured,
> diminished in value, or squandered;
>
> (2) inadequacy of available legal remedies;
>
> (3) probability that harm to the plaintiff by denial of the appointment would
> be greater than the injury to the parties opposing appointment;
>
> (4) plaintiff's probable success in the action and the possibility of irreparable
> injury to its interests in the property; and
>
> (5) fraudulent conduct on the part of the defendant.

*See id.*; § 2983Appointment of Receivers, Charles A. Wright & Arthur P. Miller, et al., 12 Fed. Prac. & Proc. Civ. § 2983 (2d ed.)

**A.  Inadequate Security and Insolvency**

The PGBC has presented evidence that Evans is valued at $10 million, and that it is liable for over $16 million in unpaid pension contributions.  Evans does not contest this evidence.  Accordingly, the Court finds that the two most important factors for appointing a receiver, inadequate security for the debt and insolvency, have been established.

**B.  Probable Success**

The PBGC has demonstrated a strong likelihood that it will succeed on the merits of its underlying foreclosure action, and Evans has not contested the essential elements of the PBGC's ERISA claim.

For purposes of this motion, Evans does not deny ERISA liability.  Evans argues, however, that it would be unfair to hold Evans responsible for the full amount of the Estate's unfunded benefit liabilities where Evans is one of approximately forty businesses controlled by the Estate.

Evans' contention that it should not be held responsible for a liability shared by the entire controlled group of businesses lacks merit.  Congress has unambiguously provided in the ERISA statute that "[i]f the contributing sponsor of any single-employer plan is a member of a controlled group, each member of such group shall be jointly and severally liable for any premiums required to be paid by such contributing sponsor."  29 U.S.C. § 1307.  Case law supports the imposition of joint and several liability on any single member of the controlled group.  *See*, *e.g.*, *PBGC v. E. Dayton Tool & Die Co.*, 14 F.3d 1122, 1125-27 (6th Cir. 1994); *PBGC v. J.D. Indus., Inc.*, 887 F. Supp. 151, 155-56 (W.D. Mich. 1994).

Because the PBGC has demonstrated that Evans is liable for the debt and that it does not have sufficient assets to meets its obligations, there can be no dispute that the PBGC has a high likelihood of success on the merits of its foreclosure action.

## C.  Risk that Property Will be Lost

The Court also finds that there is a substantial danger that Evans' property will be lost, concealed, injured, diminished in value, or squandered.  This conclusion is based on several underlying findings.  First, the Court notes that Evans has already transferred substantial sums to other operating entities and to insiders after receiving notice of the PBGC's lien and

8

at a time when Evans did not have sufficient funds to satisfy its Pension Plan liabilities.

Second, this Court is not convinced that Evans will abide by any restraining order that might be entered restricting transfers outside the ordinary course of business in light of Evans' conduct after the October restraining order was entered. Evans attempts to excuse its conduct based on its contention that the October restraining order is not valid. Evans notes that a corporation can only be represented in court by counsel, and that the stipulated restraining order was signed on behalf of Evans by Nestor, not by counsel. Even if the Court credits Evans' argument that Nestor did not have authority to bind the corporation to a stipulation to be filed in court, that does not suggest that Evans was not bound by the Court's order. *See Maness v. Meyers*, 419 U.S. 449, 459 (1975) ("[A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings."); *In re Contempt of Dudzinski*, 667 N.W.2d 68, 77 (Mich. Ct. App. 2003) ("A person may not disregard a court order simply on the basis of his subjective view that the order is wrong or will be declared invalid on appeal."). If Evans believed that the order was improvidently entered, it was incumbent on Evans to challenge the order in Court rather than to simply disregard it. Evans never made an effort to have the order based on the allegedly improper stipulation rescinded.

Third, the Court does not credit Evans' argument that it did not materially violate the restraining order. Evans contends that the October and November 2014 transfers to COO Nozoori were in the ordinary course of business because they were repayments of personal

loans Nozoori made to Evans to meet payroll and to cover raw materials.  Evans bears the burden of showing that the transfer was in the ordinary course of business between Evans and Nozoori, or that it was made according to ordinary business terms.  *See In re Prevalence Health, LLC*, Bankr. No. 0902016EE, 2012 WL 5430993, at *12 (S.D. Miss. Bankr. Nov. 7, 2012).  This determination involves a peculiarly factual analysis.  *Morris v. Schnoor*, No. 315006, 2014 WL 2355705, at *9 (Mich. Ct. App. May 29, 2014).  Evans produced no evidence under either the subjective or the objective test to support its assertion that the transfer was in the ordinary course of business.  Evans produced no documentation regarding the terms of the loan or evidence of a course of dealing.   Given the lack of evidence, the Court can only conclude, at least for purposes of this hearing, that these transfers to an insider were transfers outside the ordinary course of business in direct contravention of the terms of this Court's restraining order(citing 11 U.S.C. 547(c)(2)).  *See In re Prevalence Health*, 2012 WL 5430993, at *12 (holding that transfers to COO of the debtor in repayment of a loan was not in the ordinary course of business).

In addition, notwithstanding Nozoori's February 2015 declaration that the October and November payments of over $45,000 were the final payments on his personal loans to Evans, the PBGC advised that the overdue December bank statements Evans produced on the morning of the hearing revealed that Nozoori had been paid an additional $30,000 in December 2014.  Although counsel for Evans stated that Nozoori would explain the December $30,000 payment, Nozoori was not called to the stand.  The Court is very troubled

by the appearance that Evans is continuing to violate the restraining order and to be less than forthright with the Court and with counsel for the PBGC.

Finally, the Court is concerned that Nestor has conflicts of interest that prevent her from exercising undivided loyalty and an impartial duty of care toward Evans.  These conflicts arise from her roles as president of Evans, personal creditor of Evans, paid officer of Asset Manager, personal representative of the Estate, and residual beneficiary of the Estate.  Nestor affirmatively asserts that she has "managed the Estate's holdings with the goal of maximizing the total value of the Estate's assets," and that she has "ensured that the Estate, and its related entities, have paid approximately $55 million in estate and gift taxes, along with $22 million in pension contributions" (Nestor Decl. ¶¶ 7, 14).  These statements, and her practice of transferring assets from Evans to the Estate and the other Operating Entities in which she has an interest to meet their payroll and their underperfected or later perfected tax obligations highlight her conflict of interest and/or her failure to honor the priority of the Pension Plan's lien.

Based on all of these considerations, the Court finds that there is a high risk that the property of Evans will be lost, concealed, injured, diminished in value, or squandered if a receiver is not appointed.

## D.  Inadequacy of Legal Remedies

The Court concludes that legal remedies are inadequate because the PBGC cannot recover assets that have been transferred to meet the payrolls of the Estate and the other affiliated entities.

11

**E.  Balance of Harms**

The Court must consider whether the harm to the Pension Plan by denial of the appointment would be greater than the injury to Evans if a receiver were appointed.  The PBGC contends that a receiver is necessary to preserve the company's assets and to sell the company as a going concern in order to save the employees' jobs.  Evans, on the other hand, contends that the appointment of a receiver would place a profitable company and many jobs in jeopardy.

Other than pointing out that the appointment of a receiver would cost money, Evans has not identified any other manner in which the appointment of a receiver would jeopardize Evans or its employees.  It appears to the Court that the on-going success of Evans is already in jeopardy because of the Pension Plan's liens, the PBGC's likelihood of success on its forfeiture claim, and Evans' practice of transferring funds out of Evans to support the Estate and the other Operating Entities.  It appears that the harm to Evans if a receiver were appointed would be less than the harm to the Pension Plan if the current status quo were maintained.

**F.  Alternative Remedies**

As Evans has argued, and as this Court has previously noted, a receiver should not be appointed if less drastic remedies exist. *Sheet Metal Workers' Local 7*, 2009 WL 3246959, at *2.  However, when the Court asked Evans' counsel to suggest alternatives that would preserve Evans' assets, the only suggestion he offered was the re-filing of the restraining

12

order.  Because Evans has already shown a lack of regard for the Court's authority to enter orders and a  propensity to circumvent the clear language of the Court's orders, the re-filing of the restraining order would not protect Evans' property from further harm, loss, and diminution.  The Court concludes that appointment of a receiver is clearly necessary to protect the Pension Plan's lien on Evans' property and the jobs of Evans' employees, and that no less drastic remedies exist.

## III.

For the reasons stated above, the Court will enter an order appointing a receiver pursuant to the terms outlined in the proposed order filed by the PBGC.  (ECF No. 28-2.) Within ten days of this opinion and order, the PBGC shall nominate an individual for appointment as the receiver and shall provide the Court and opposing parties a copy of that individual's credentials and curriculum vitae.  Defendants shall have seven days from the date of that nomination to file any objections.  The Court will consider the nomination and any objections, and make a decision accordingly.

Until a receiver is appointed, the restraining order entered on October 8, 2014, (ECF No. 17) will remain in effect.

An order consistent with this opinion will be entered.


Dated: March 18, 2015                                    /s/ Robert Holmes Bell
                                                         ROBERT HOLMES BELL
                                                         UNITED STATES DISTRICT JUDGE


13